UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

ADVANCED VIDEO TECHNOLOGIES LLC,

      Plaintiff,

    -against-

HTC CORPORATION and HTC AMERICA,
INC.,

      Defendants.
_____ x

ADVANCED VIDEO TECHNOLOGIES LLC,

      Plaintiff,

    -against-

BLACKBERRY, LTD. AND BLACKBERRY
CORPORATION,

      Defendants.
_____ x

ADVANCED VIDEO TECHNOLOGIES LLC,

      Plaintiff,

    -against-

MOTOROLA MOBILITY LLC,

      Defendant.
_____ x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: |
| DATE FILED: 6/14/16 |

No. 15 Civ. 4626 (CM)

No. 15 Civ. 4631 (CM)

No. 15 Civ. 4632 (CM)

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE COMPLAINT WITH PREJUDICE

McMahon, J.:

This is the second trio of patent infringement actions that Plaintiff Advanced Video Technologies ("AVT") has filed against Defendants HTC Corporation and HTC America, Inc. ("HTC"), Blackberry Limited and Blackberry Corporation ("Blackberry"), and Motorola Mobility LLC ("Motorola") (collectively, "Defendants").

In the first three cases, filed in 2011, AVT sued the Defendants for infringement of United States Patent No. 5,781,788 ("the '788 Patent"), entitled "Full Duplex Single Chip Video Codec." (*See* 11 Civ. 6604, Docket #1.)[1]  In December 2014, Defendants moved to dismiss AVT's complaints for lack of standing.  They made three arguments about why the court should dismiss the complaint, but the court needed to address only one, since it turned out that AVT did not actually own the '788 patent, and so lacked standing to sue for the patent's infringement. The original cases were dismissed in April 2015.  *See Advanced Video Techs., LLC v. HTC Corp.*, 103 F. Supp. 3d 409, 418 (S.D.N.Y. 2015) (the "2015 Decision").

Following that dismissal, AVT took various steps to acquire good title to the patent and to obtain an assignment of claims from the entity that it believed to be the actual owner of the patent. Once that process was complete, AVT filed these new lawsuits for infringement of the

---

[1] Case numbers for Plaintiff's prior actions are 11 Civ. 6604, 11 Civ. 8908, and 12 Civ. 0918. Case numbers for the actions currently before the court are 15 Civ. 4626, 15 Civ. 4631, and 15 Civ. 4632. For simplicity's sake, I will use 11 Civ. 6604 and 15 Civ. 4626 to identify filings in the first and second sets of actions, respectively.

'788 patent. (*See* 15 Civ. 4626 Docket #1.)   And this motion to dismiss followed as the night the day – raising anew the arguments that were not reached the first time around.[2]

Defendants' principal argument is that AVT owns at most a two-thirds undivided interest in the '788 patent, while a woman named Vivian Hsiun has a one-third ownership interest in the patent. Hsiun is not a party to this action, so Defendants ask the court to dismiss for failure to join a co-owner of the patent (which the parties, and the Federal Circuit, frame as an issue of standing) – it being well settled that a patent infringement action cannot be maintained unless every owner of the patent is a plaintiff.

Defendants are again correct. For the reasons discussed below, Defendants' motion to dismiss the Complaint under Rules 12(b)(6) and 12(b)(7) of the Federal Rules of Civil Procedure is granted, with prejudice.

## BACKGROUND

The opinion and order dismissing the prior actions set forth in excruciating detail the background to this motion. I assume the parties' familiarity with those facts and will summarize them only as necessary, adding a few new facts that relate to things that occurred after this court issued its opinion.

---

[2] Defendants do not challenge AVT's constitutional standing on this motion (although they reserve the right to do so at a later date), so for purposes of this opinion I will assume that AVT has in fact obtained anything and everything relating to title to the patent that it could acquire from AVC Technology Inc. ("AVC"), one of AVT's predecessors in interest.   (*See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss Under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(7) ("Def. Br."), Docket No. 19 at 5 n.1.)

3

### The Patent In Suit

The '788 Patent is entitled "Full Duplex Single Chip Video Codec." The invention aids the compression and transmission of video information. (*See* Compl. Ex. A at 2.) It was created by three co-inventors: Beng-Yu "Benny" Woo, Xiaoming Li, and Vivian Hsiun. (*See* Compl. ¶ 8.) The invention appears to have been invented sometime after January 1992 (*see infra* at 5), but all parties agree that it was created while at least one of the inventors – Hsiun – was affiliated with a company called Infochips Systems Inc. ("Infochips"). It is undisputed that neither the three inventors nor Infochips ever filed an application for a patent on the invention.

### Hsiun's Employment Agreement

In January 1992, Hsiun signed an employment contract with Infochips (the "Employment Agreement"). Section 2 of the Employment Agreement is entitled "Retaining and Assigning Inventions and Original Works." Section 2.b, under the subheading "Inventions and Original Works Assigned to the Company," provides as follows:

> I agree that I will promptly make full written disclosure to the Company, *will hold in trust* for the sole right and benefit of the Company, and *will assign to the Company all my right, title, and interest in and to any and all inventions, original works of authorship, developments, improvements or trade secrets which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of the Company.*

(Chen Decl., Ex. 3 at AVT0000120 (emphasis added).) In section 2.e, the Agreement further states:

> *I agree that my obligation to assist the Company to obtain United States or foreign letters patent,* copyrights, or mask work rights covering inventions, works of authorship, and mask works, respectively, *assigned hereunder to the Company shall continue beyond the termination of my employment,* but the Company shall compensate me at a reasonable rate for time actually spent by me at the Company's request on such assistance. *If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign letters patent,* copyrights, or mask work rights covering inventions or other rights assigned to the Company as above, *then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any*

4

> *such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent*, copyrights, and mask work rights with the same legal force and effect as if executed by me. *I hereby waive and quitclaim to the Company any and all claims, of any nature whatsoever, which I now or may hereafter have infringement [sic] of any patents*, copyrights, or mask work rights resulting from any such application assigned hereunder to the Company.

(*Id.* at AVT0000121 (emphasis added).)

Section 6.d of the Employment Agreement, entitled "Successors and Assigns" further provides that the agreement will be for the benefit of the Company, its successors, and its assigns. (*Id.* at AVT0000123.)

Section 7 of the Employment Agreement is entitled "List of Inventions" and states that "Pursuant to Section 2(a) of this Agreement below is a list of my prior inventions and original works of authorship." The Employment Agreement goes on to say "IF NO PRIOR INVENTIONS OR ORIGINAL WORKS OF AUTHORSHIP ARE LISTED IN THIS SECTION 7, I HEREBY AFFIRM THAT THERE ARE NO SUCH INVENTIONS OR ORIGINAL WORKS OF AUTHORSHIP." (*Id.* at AVT0000124.) No such prior inventions or works of authorship are listed. It would thus appear that as of January 1992, Hsiun and her co-inventors had yet to create the invention that forms the basis for the '788 patent.

<u>The Assignment of the Employment Agreement to LMS</u>

Over a year before Hsiun signed the Employment Agreement, Infochips had entered into a financing agreement (the "Security Agreement") with Lease Management Services ("LMS"). The Security Agreement granted LMS a secured interest in Infochips' "Receivables," defined in the agreement as:

> Accounts, Instruments, Documents, Chattel Paper and General Intangibles (as defined in the Uniform Commercial Code) and all other rights arising from the sale of Debtor's Inventory; all of Debtor's rights and remedies relating to the foregoing, including guaranties or other contract rights; all books and records; including ledger cards, relating to the foregoing and all proceeds of the foregoing.

5

(*Id.* at AVT0000115.)

The Security Agreement was expressly governed by California law, so California's

Uniform Commercial Code ("UCC"), as incorporated into the California Commercial Code,

defines the term "General Intangibles." (*See id.* at AVT0000118.) "'General intangibles' means

any personal property (including things in action) other than goods, accounts, chattel paper,

documents, instruments, and money." Cal. Comm. Code § 9106 (version in effect in 1990).

Defendants argue that the assets pledged to LMS do not include Hsiun's Employment

Agreement because the Employment Agreement, while falling within the definition of "General

Intangibles," was executed after LMS and Infochips signed the Security Agreement. (*See* Def Br.

at 17.) But as discussed briefly in the 2015 Decision, a secured interest in inventory or

receivables typically reaches after-acquired property – otherwise the flow of inventory out would

quickly turn a secured interest into an unsecured interest. *See Advanced Video Techs.*, 103 F.

Supp. 3d at 413. That is the case under California law.

Under § 9204 of the California Commercial Code as it stood in 1990 – the year the

Security Agreement was executed – security agreements could provide that "any or all

obligations covered by the … agreement are to be secured by after-acquired collateral." Cal.

Comm. Code § 9204 (in effect in 1990). The commentary to § 9204 clarified that, "An after-

acquired property clause in an inventory lien agreement is valid in California, provided that the

merchandise is from time to time … designated in one or more separate written statements dated

and signed by the borrower and delivered to the lender." *Id.* (internal citation omitted). Thus,

California has expressly sanctioned "the concept of the floating lien as it may be applied as a

security device with respect to a debtor's present and future assets." *Biggins v. Sw. Bank*, 490

F.2d 1304, 1309 (9th Cir. 1973).

To determine whether the parties intended for their security agreement to apply to after-acquired collateral, courts parse the language of the agreement. *Id.* The Security Agreement plainly provided that it reached after-acquired "Receivables." Section b of the Security Agreement stated that "Debtor shall submit to Secured Party current monthly "aging" reports of its Receivables containing the following information and such other information as Secured Party shall require to evaluate the status of the Receivables individually and in the aggregate." (Chen Decl., Ex. 3 at AVT000016). The required information included:

(i) The name and address of the Customer with respect to each Receivable,

(ii) The invoice number or other identification of each outstanding Receivable,

(iii) The outstanding amount of each Receivable and the aggregate of the Receivables as at the end of the month; and

(iv) The "age" of each Receivable (i.e., the time which has transpired since the invoice was issued) ...

(*Id.*) Section b. also required that the "monthly aging report ... be submitted to Secured Party no later than the tenth day after the end of such month covered by the aging report." (*Id.*)

The Security Agreement clearly contemplated the inflow and outflow of Receivables. Indeed, it expressly required the type of report envisioned in the commentary to § 9204 – a report that would only make sense if the Security Agreement reached after-acquired property.

It is true that one does not ordinarily think of an Employment Agreement as a "receivable;" in the ordinary course, that term applies to things like accounts payable. But the contract most certainly is a "General Intangible," and per the terms of the Security Agreement "General Intangibles" are "Receivables." Ergo, Hsiun's Employment Agreement is a Receivable for purposes of the Security Agreement. And since the Security Agreement extends to after-

7

acquired Receivables, it does not matter that the Employment Agreement was signed after Infochips pledged its assets to LMS.

>AVC Applies for a Patent and Acquires Whatever It Acquires

In 1993, Infochips went out of business. LMS seized the pledged assets under the Security Agreement – including, Plaintiff argues, whatever rights to the invention Hsiun's Employment Agreement conferred. (*See id.* at AVT0000126-27.)

In 1995, LMS sold the pledged assets of Infochips to one of the three co-inventors – Benny Woo. Woo in turn transferred his interest in the property to the entity known as AVC. *Advanced Video Techs.,* 103 F. Supp. 3d at 413-14.

On May 8, 1995, AVC filed the parent application for what ultimately became the '788 patent.

In connection with its application, AVC had to prove that it owned the invention. Two of the three inventors, Woo and Li, made that easy – they executed assignments of their interest in the invention to AVC. The third inventor, Hsiun, refused, despite repeated efforts to obtain her signature on an assignment. *Advanced Video Techs.,* 103 F. Supp. 3d at 414.

Rather than sue Hsiun for specific performance of her contractual obligation to assist in the obtaining of the patent – an obligation that expressly extended beyond the term of her employment with Infochips – AVC chose to pursue the patent application without her. But AVC also did not execute a document assigning Hsiun's interest to itself – even though the Employment Agreement contained a provision giving Infochips an irrevocable power of attorney-agency to execute documents needed to prosecute a patent application on her inventions (a power AVT contends gave Infochips' successors the right to effect such an assignment). Instead, AVC took the position that Hsiun had assigned her interest in the invention over to

8

Infochips back in 1992, when she signed the Employment Agreement containing the words, "I agree that I … will assign to the Company all my right, title, and interest in and to any and all inventions." (Chen Decl., Ex. 3 at AVT0000120.)

To make that assertion, Woo filed a declaration with the patent office, attaching "a copy of the agreement whereby the omitted inventor agreed to assign this invention and the documentation wherein the rights in said agreement were purchased by me." (Chen Decl., Ex. 3 at AVT0000107.) The agreement he attached was Hsiun's Employment Agreement. AVC filed this same declaration in 1997, when the original application was abandoned in favor of a daughter application. The application filed became the '788 patent.

Notably, the declaration does not say, "… attaching a copy of the assignment of this invention by the omitted inventor," but rather "… attaching a copy of the agreement whereby the omitted inventor *agreed to assign* this invention." (*Id.* (emphasis added).) That is consistent with the phrasing of the agreement itself, which says "I agree that I … will assign," not "I hereby assign…." The import of these different phrases is discussed below.

The patent issued in 1998. It listed Woo, Li and Hsiun as the inventors and AVC as the owner by assignment.

The convoluted history of what occurred over the next 15 years is the story of the earlier cases, the decision in which can be found at *Advanced Video Techs., LLC v. HTC Corp.*, 103 F. Supp. 3d 409 (S.D.N.Y. 2015). It is not necessary to address any of those facts in order to decide this motion, so I will not bother to recite them. The curious reader is urged to read the prior opinion.

The 2015 Decision and Subsequent Events

On April 28, 2015, this court issued its decision holding that AVT did not own the '788

patent. AVT did not take an appeal from that decision. It is, therefore, final and binding on the

parties and preclusive as to all facts found by the court.

Instead, on May 1, 2015, AVT applied to the Court of Chancery of the State of Delaware

for appointment of a Receiver for AVC. (Compl. ¶ 13; Ex. D.)

On May 13, 2015, the Court of Chancery granted AVT's petition and appointed a

Receiver for the now-dissolved AVC. The Receiver was appointed "for the sole purpose of

transferring any ownership interest that AVC may have in [the '788 patent]." (*Id.* ¶ 14; Ex. E.)

On June 5, 2015, the Receiver executed an Assignment that transferred all rights, title and

interests in the '788 patent from AVC to AVT. (*Id.* ¶ 15; Ex. F.) The Receiver made no effort to

figure out what rights, title or interests AVC might have owned; he simply transferred whatever

AVC did own to AVT.

The Assignment states, in its entirety:

> I, Joseph Cicero, appointed by the May 13, 2015 Order of Chancellor Andre
> Bouchard of the Delaware Court of Chancery in the matter styled In Re A
> VC Technology, Inc., Civil Action No. 10981-CB, as the Receiver for AVC
> Technology, Inc., a dissolved Delaware Corporation ("Assignor"), have
> quitclaimed, assigned, transferred, set over and conveyed and do hereby
> quitclaim, assign, transfer, set over and convey unto Advanced Video
> Technologies LLC, a New York limited liability company ("Assignee"), its
> successors, and assigns, any and all right, title, and interest to United States
> Patent No. 5,781,788 (the "Patent") held and enjoyed by Assignor, for the
> entire term of the Patent, including any reissues, reexaminations, and
> extensions thereof, including the right to sue for and recover damages in
> respect of past acts of infringement. This assignment includes, but is not
> limited to, all Assignor's right to all income, royalties, damages and
> payments now or hereafter due and payable, and in and to all causes of
> action, either in law or in equity, and the right to sue and counterclaim for
> and collect past and continuing damages for infringement. The right, title
> and interest conveyed in this Assignment is to be held and enjoyed by
> Assignee and Assignee's successors and assigns as fully and exclusively as

10

it would have been held and enjoyed by Assignor had this assignment not
been made.

(*Id.*, Ex. F.).

### Questions Presented by the Motion

1.     Did Hsiun, a co-inventor, assign to Infochips her interest in the '788 patent when
she signed her employment agreement, as AVC asserted to the Patent Office?

2.     If the answer to the first question is no, did AVT acquire Hsiun's interest in the
'788 patent in some other way, such that her participation in this lawsuit is not required?

### DISCUSSION

### I.  Standard

#### A.     Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must include "sufficient
factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft
v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atlantic
Corp. v. Twombly,* 550 U.S. 554, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  The court in
*Iqbal* suggested a "two-pronged approach" for evaluating the sufficiency of a complaint.  Under
the first prong, a court should "choose to begin by identifying pleadings that, because they are no
more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.  Under the second
prong, "When there are well-pleaded factual allegations, a court should assume their veracity and
then determine whether they plausibly give rise to an entitlement for relief." *Id.*  A claim is
plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly,* 550

11

U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

In considering a motion to dismiss pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. *Rogers v. Blacksmith Brands, Inc.*, 2011 WL 6293764, at \*4 (S.D.N.Y. Dec. 13, 2011) (citing *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). A district court may also consider a document that is not incorporated by reference, where the complaint " 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Rogers*, 2011 WL 6293764 at \*4 (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

### B.     Rule 12(b)(7)

A motion to dismiss pursuant to Rule 12(b)(7) is subject to a two-prong analysis. *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000), *abrogated on other grounds as stated in Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 179 (2d Cir. 2007). First, the court must determine whether the party qualifies as a "necessary" party under Rule 19(a). *Id.* Where a party is necessary to the cause of action, the court must then determine "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable," pursuant to a consideration of factors listed in in Rule 19(b)(1)-(4). *Id.* at 725 (quoting rule 19(b)).

It is a "generally accepted principle that the court is not limited to the pleadings on a Rule 12(b)(7) motion." *Fagioli S.p.A. v. Gen. Elec. Co.*, No. 14-CV-7055 AJN, 2015 WL 3540848, at \*4 (S.D.N.Y. June 5, 2015).

12

## II. Prudential Standing

As discussed in the 2015 Decision, prudential standing is a question of statutory

interpretation concerning who has a cause of action under the statute and under what

circumstances. *See Advanced Video Techs.*, 103 F. Supp. 3d at 417-18. "Prudential concerns

sometimes require the dismissal of infringement suits in the absence of patent co-owners,

because a defendant should not be sued repeatedly for the same acts of infringement and on the

same patent." *Id.* (citing *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 288 F. App'x 697, 704-05

(Fed. Cir. 2008)). "So too, a co-owner's patent rights can be said to include the right to impede

another co-owner's pursuit of infringement actions." *Id.* (citing *STC.UNM v. Intel Corp.*, 767

F.3d 1351, 1353 (Fed.Cir.2014) (quoting *Schering Corp. v. Roussel -UCLAF SA*, 104 F.3d 341,

345 (Fed.Cir.1997) ("Ordinarily, one co-owner has the right to impede the other co-owner's

ability to sue infringers by refusing to voluntarily join in such a suit.") (internal citation

omitted))).

For this reason, it is imperative to decide whether Hsiun retains any interest in the '788

patent. If she does not, then this action may proceed; if she does, it must be dismissed.

## III. Hsiun Owns a One Third Interest in the '788 Patent

### A. Hsiun Did Not Assign Her Interest in the Invention/Patent When She Signed the Employment Agreement

Ownership of an invention vests initially with the inventor. See, *e.g., Bd. of Trs. of*

*Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 785 (2011). Unless

assigned pursuant to 35 U.S.C. § 261, the "initial ownership of a patent vests in the inventor by

operation of law." *Regents of Univ. of N.M. v. Knight*, 321 F.3d 1111, 1119 (Fed. Cir. 2003).

Two thirds of the title to the invention that underlies '788 patent – and hence, a two-

thirds interest in the patent itself – was plainly assigned to AVC by inventors Woo and Li. But

Hsiun refused to assign anything to AVC. So Woo told the Patent Office that she had assigned her interest in the invention years earlier, and the Patent Office apparently bought his story.

But Woo's declaration to the patent office did not confer title to Hsiun's share of the invention/patent on AVC – any more than AVT's belief that AVC had passed title to the patent to Epogy turned *that* assertion from error to truth. *See Advanced Video Techs.,* 103 F. Supp. 3d at 424. What Woo may have believed (or hoped) about the ownership issue is irrelevant because – as has been said before in the context of this dispute – saying so does not make it so. The question is whether, as a matter of law, Hsiun's signature on her Employment Agreement operated to assign her one third share in the invention to Infochips, AVT's predecessor in interest twice removed. If it did not, then no matter what Woo said to the Patent Office, AVC did not own 100% of the '788 invention by assignment at the time it obtained the patent.

So we turn to the Employment Agreement, to see what, if anything, Hsiun assigned to Infochips.

The answer is: nothing.

While state law governs the interpretation of contracts generally, "the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases" and is treated as a matter of federal law. *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008). "[W]hether an assignment of patent rights in an agreement … is automatic, requiring no further act on the part of the assignee, or merely a promise to assign depends on the contractual language." *Id.*

Section 2.b of Hsiun's contract states, "I agree that I . . . *will hold in trust* … and *will assign* to the Company all my right, title, and interest in and to any and all inventions." (Chen

14

Decl., Ex. 3 at AVT0000120 (emphasis added).) The words "will assign," read naturally, refer to something Hsiun is agreeing to do in the future. And indeed, that is how these words have been interpreted by the courts.

The language of Hsiun's Employment Agreement is virtually identical to the language parsed by the Federal Circuit in *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574 (Fed. Cir. 1991). In that case, Plaintiff Arachnid had been assigned rights in a patent by the patent's co-owners. One such contractual assignment stated that rights to any inventions "will be assigned" by the inventor to Arachnid. The Federal Circuit held that language stating that inventions "will be assigned" by one entity to another did not create a present assignment of property rights, but rather was an agreement to assign those rights. Since, that promise notwithstanding, no such assignment was ever consummated, the Federal Circuit concluded that Arachnid was merely co-owner of the patent, and so lacked standing to sue for patent infringement. *Id.* at 1580.

By contrast, in *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245 (Fed. Cir. 2000), cited by AVT, the court parsed contract language stating that inventions "*shall belong* exclusively to [Speedplay][,] and [the employee-inventor] *hereby conveys, transfers and assigns* to [Speedplay] . . . all right, title and interest in and to Inventions." *Id.* at 1253 (emphasis added). The Defendant Bebop argued that the use of the phrase "shall belong" made the contract an agreement to assign, but the Federal Circuit, focusing on the words "*hereby conveys*, transfers and assigns," concluded that the agreement constituted a present assignment of patent rights. That, too, is the natural reading of the language; "hereby" means "by this document," which is being executed presently and not in the future.

The *Speedplay* court relied principally on *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1570 (Fed. Cir. 1991). In *Filmtec*, the Federal Government insisted that a contract

15

granting it all of the right, title and interest in future inventions by the inventor operated as a present assignment, even though the inventions had not yet been created when the contract was signed. The Federal Circuit agreed, but did so because the contract said that MRI (the inventor), "… agrees to grant *and does hereby grant to the Government* the full and entire domestic right, title and interest" in any present *or future* invention. (Emphasis added). The words "does hereby grant" proved critical, because they indicated that the parties "did not merely obligate MRI to grant future rights, but expressly granted to the Government MRI's rights in any future invention." The court reasoned that "no further act would be required once an invention came into being; the transfer of title would occur by operation of law." *Id.* at 1573. *See also Imatec, Ltd. v. Apple Computer, Inc.*, 81 F. Supp. 2d 471, 482 (S.D.N.Y. 2000) *aff'd, 15 F. App'x 887* (Fed. Cir. 2001).

There is no similar "hereby" language in Hsiun's Employment Agreement. She simply says that she "will hold" her inventions "in trust" for Infochips and "will assign" them to Infochips. (Chen Decl., Ex. 3 at AVT0000120.) "Will" is the language of a promise to do something in the future; it does not suggest present action.

Even more explicit is the language in *Regents of Univ. of N.M. v. Knight*, 321 F.3d 1111 (Fed. Cir. 2003). There, various agreements between the employee-inventors and their University employer – including a Patent Policy, a Co-Inventor Agreement, powers of attorney, and certain Joint Assignments to parent patent applications – included the following language:

- "Such inventions and discoveries belong to the University,"
- The employees shall cooperate with the university including by "providing information needed for preparation of patent applications and associated documents [and] review and signing of patent applications and associated documents,"
- "The University is the owner of the Inventions,"

16

- "It is understood by the Parties that [the University] as the owner of the Inventions has the right to assign or license any of the Inventions," and

- Employees are required "to sign all lawful papers, to execute all divisions, continuations, substitutions, renewal, and reissue applications, [and] to execute all necessary assignment papers to cause any and all of said Patents to be issued to [the University]."

*Regents*, 321 F.3d at 1119-20 (Fed. Cir. 2003). The Federal Circuit concluded that the agreements "expressly vest ownership of the parent applications in [the University]. Furthermore, all of those documents imposed upon [the inventors] a continuing duty to cooperate in the prosecution of patent applications, which expressly includes 'signing ... patent applications and associated documents' and 'execut[ing] all necessary assignment papers.'" *Id.* As such, the Federal Circuit, like the district court, declared that the University owned the patents in suit. *Id.* at 118-123.

There is yet another reason why the Employment Agreement's "will assign" language cannot be read as a present assignment, but must be construed as a promise to assign in the future. The Employment Agreement provides that Hsiun "will hold" her inventions "in trust for Infochips." Promising to hold inventions in trust for a third party is absolutely and utterly inconsistent with a present assignment of one' interest in the invention to that party. If, by signing the Employment Agreement, Hsiun were signing away her rights to her inventions, she would not need to hold them in trust for anyone – she would already have given them away! But the contract language plainly contemplates that Hsiun would keep title to her inventions (albeit for the benefit of her employer) until such time as she executed the assignment contemplated by the contract. I find this language to be dispositive of the issue of present assignment.

AVT points to other language in the Employment Agreement to support its claim that Hsiun made a present assignment of rights in 1992. For example, it notes that the subheading of section 2.b is "Inventions and Original Works *Assigned* to the Company" (Chen Decl., Ex. 3 at

17

AVT0000120 (emphasis added)), and argues that this means that section 2.b operates as a present assignment of Hsiun's rights.

I disagree. The use of the past tense "assigned" in the subheading must be read in conjunction with the operative words in the text of the agreement, which are most decidedly not in the past or the present tense, but in the future tense – "will assign," not "have assigned" or "hereby assigns." The natural reading of the heading and text taken together is that Section 2.b applies to inventions and original works that are actually assigned to the company *once they are in fact assigned* in accordance with the terms of the Agreement. Furthermore, under California law (which governs the Employment Agreement), the fact that the past tense language is in a heading makes it more or less irrelevant, since "the absence of a fully descriptive heading does not restrict the plain meaning of the provision." *Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.*, 163 Cal. App. 4th 1387, 1395, 78 Cal. Rptr. 3d 264, 270 (2008).

AVT also points to Section 2.e of the Employment Agreement, which states, "I agree that my obligation to assist the Company to obtain United States or foreign letters patent, copyrights, or mask work rights covering inventions ... *assigned hereunder to the Company* shall continue beyond the termination of my employment." (Chen Decl., Ex. 3 at AVT0000121 (emphasis added).) AVT argues that the language of section 2.e assumes that section 2.b has already effected an assignment of rights.

But once again, AVT offers a strained reading of the language. The phrase "inventions.....assigned hereunder to the Company" plainly refers to any inventions that may be from time to time assigned in accordance with Section 2.b – which is not, by its terms, a present assignment. Indeed, the only way to make Section 2.e consonant with Section 2.b is to conclude

18

that section 2.e applies only to inventions that Hsiun actually assigned to Infochips. No such assignment was executed in connection with the invention underlying the '788 patent.

Thus, the most natural reading of the Employment Agreement – as was the case in *Arachnid* – is that the Agreement merely obligated Hsiun to grant future rights to Infochips. It did not effect a present assignment of rights to any future inventions.

**B.     AVT Does Not Otherwise Own All Necessary Rights in the Patent**

That ruling does not dispose of this case. AVT makes two other arguments for why it owns the entire interest in the patent.

### 1.  AVT Has No Rights Under the So-Called Power of Attorney Clause That Allow it to Avoid the Doctrine of Prudential Standing

The argument the court considers to be the principal argument is AVT's assertion that, per the "power of attorney" clause in section 2.e of the Employment Agreement, "The right to act as Ms. Hsiun's agent went to AVC as a successor-in-interest, and the Receiver assigned whatever rights Ms. Hsiun may have had (if any) to Plaintiff AVT on June 5, 2015." (Pl. Opp., Docket No. 26, at 6.) Defendants respond that "AVT's arguments are irrelevant because *no one ever signed any assignment papers on behalf of Ms. Hsiun* during prosecution of the '788 patent using the alleged power of attorney, *which did not extend to anything beyond issuance of the patent.*" (Defs.' Reply Br. in Support of Their Mot. to Dismiss, Docket No. 27, at 11-12 (emphasis in original).)

Defendants are correct.

19

> a. *The Employment Agreement Created an Agency Coupled with an Interest*

Section 2.e of the Employment Agreement obligates Hsiun to "assist the Company *to obtain United States or foreign letters patent*, copyrights, or mask work rights covering inventions, works of authorship, and mask works, respectively, assigned hereunder to the Company." (Chen Decl., Ex. 3 at AVT0000121 (emphasis added).) It further provides that:

> If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign letters patent, copyrights, or mask work rights covering inventions or other rights assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyrights, and mask work rights with the same legal force and effect as if executed by me.

(Chen Decl., Ex. 3 at AVT0000121.)

Under the law of agency, Infochips' rights under the power of attorney clause are best characterized as an agency coupled with an interest (or, as it is referred to in the Restatement, as a "power given as security" (Restatement (Third) Of Agency § 3.13 (2006)).

"The requirements for the creation of an agency coupled with an interest are (1) that the agency be held for the benefit of the agent and not the principal, (2) that the agency is created to secure the performance of a duty to the agent or to protect a title in him, and (3) that the agency is created at the same time the duty or title is created or is created for consideration." *Lombardo v. Santa Monica Young Men's Christian Assn.*, 169 Cal. App. 3d 529, 541, 215 Cal. Rptr. 224, 231 (Ct. App. 1985). Here, the creation of the agency was clearly for the benefit of Infochips – the power of attorney granted Infochips the right to sign Hsiun's name, should she refuse to comply with certain obligations in the Employment Agreement. It was created to secure the

performance of a duty – that is, to force Hsiun, in one way or another, to comply with those obligations. And the agency was created at the same time – indeed, by the very same contract – as the underlying duty was created.

In California, "A written grant of authority or a power of attorney that is not subject to the statutory provisions regarding powers of attorney is subject to the common law of agency relating to the creation, termination, and revocation of the agent's authority, and the authority of the agent is prescribed by the common law and the express provisions of the written grant of authority." 1 Cal. Real Est. § 1:98 (4th ed.). An agency coupled with an interest is not subject to California's statutory provisions regarding power of attorney, and so is governed by common law. *See* Cal. Prob. Code § 4050(b)(1). Under the common law, an agency coupled with an interest may not be terminated at the will of the principal. Rather, it is an irrevocable power, and the agent (for whose benefit the agency was created) may seek specific enforcement of its interest in the event that the principal attempts to revoke the agency. Restatement (Third) Of Agency § 3.12 (2006) (Comment B). In our case, the Employment Agreement explicitly makes the power irrevocable.

The parties have not briefed the issue of whether an agency coupled with an interest passes automatically to the agent's successors and assigns under California law. Certainly, the Employment Agreement is not as helpful as it might be, since it does not define the term "Company," for purposes of this (or any) clause therein, as "Infochips, its subsidiary or affiliate *and its successors and assigns*." It simply defines the term "Company" as "Infochips, its subsidiary or affiliate." AVC (and before that, LMS) was neither a "subsidiary" nor an "affiliate" of Infochips. All AVC did was purchase certain pledged assets of Infochips from the latter's lender, LMS.

However, the Employment Agreement does contain a clause stating that its provisions were intended "for the benefit of" Infochips and its successors and assigns. Section 6.d of the Employment Agreement states, "This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns." (Chen Decl, Ex. 3 at AVT0000123.) The Employment Agreement also contains a "survival" clause, which states that, "The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee." (*Id.*)

One of the provisions that was of "benefit" to Infochips, and that would be of benefit to its "successors and assigns," was the agency coupled with an interest, because it was intended irrevocably to facilitate the prosecution of patent applications despite Hsiun's failure to cooperate.

Woo purchased, *inter alia*, the Employment Agreement from LMS. Although the record is silent about whether the purchase of this asset (for the Employment Agreement was an asset) constituted "an assignment of this agreement by the Company to any successor in interest or other assignee," I will assume without deciding that there was such an assignment.[3] Woo subsequently assigned his interest in the assets he had purchased from LMS to AVC. Since Hsiun's employment had long since ended, the only rights against Hsiun that AVC might have acquired were those rights that Infochips retained following the termination of Hsiun's employment.

---

[3] To be completely frank, I doubt there was such an assignment, and I am sure AVT could not prove that one occurred. Whether the sale of the contract without an assignment transferred Infochips' rights under the contract is (1) not briefed and (2) open to question. But I need not, and therefore do not, resolve this issue.

22

One of those surviving rights was the right to compel Hsiun to live up to her obligation to cooperate in the prosecution of the patent. But assuming *arguendo* that AVC ever really succeeded to this right, Woo did not choose to exercise it. That is, he did not elect to sue Hsiun for her undoubted breach of that obligation, which expressly survived termination.[4]

Another surviving enofrcement right was the agency coupled with an interest. The holder of that power had the right (1) to sign Hsiun's name to "patent applications," if she failed to sign them herself and the right (2) to engage in all "all other lawfully permitted acts *to further the prosecution and issuance of letters patent...*" (Chen Decl., Ex. 3 at AVT0000121 (emphasis added).) There is at least an argument that effecting an assignment of Hsiun's interest in the underlying invention (an assignment Hsiun refused to make) could constitute a "lawfully permitted act[] to further the prosecution" of the patent. If it were necessary for AVC to demonstrate that it held 100% title to the invention in order to prosecute an application for a patent solely in its name, and if the only way for AVC to own 100% of the invention was for Hsiun AVC to assign her rights in the invention, then the power to do "lawful acts to further the prosecution" of the patent would seem to include the power to sign Hsiun's name to an assignment. As it is unnecessary to decide this issue as well, I assume – again, for the sake of argument only – that such an assignment would fall within the powers conferred upon Infochips and its successors-in-interest by section 2.e of the Employment Agreement.

**But neither Woo nor AVC ever signed Hsiun's name, either to a patent application or to any assignment of her interest in the invention.** Instead, Woo asserted to the PTO that Hsiun had assigned her interest in the patent to Infochips back in 1992, by virtue of her signing

---

[4] This fact might be thought to suggest that Woo himself doubted that he had succeeded to the surviving enforcement rights under the Employment Agreement, but again, I need not go there.

the Employment Agreement. As detailed above, that assertion was (like so many of the assumptions made by AVT and its various predecessors in interest) factually and legally erroneous.

Thus, AVC did not ever obtain Hsiun's 1/3 interest in the patent, to which Hsiun was entitled as a matter of law because she was an inventor who never assigned away her rights. *See Regents of Univ. of N.M. v. Knight*, 321 F.3d 1111, 1119 (Fed. Cir. 2003) (absent an assignment, "initial ownership of a patent vests in the inventor by operation of law"). AVC had a 2/3 interest in the patent and Hsiun retained her 1/3 interest (admittedly in violation of her contractual obligations). The failure to sign Hsiun's name to a patent application or to effect any assignment of Hsiun's interest is simply another instance of Plaintiff's bluffing with respect to ownership of the patent and hoping no one would notice. But someone did notice – namely, Motorola, Blackberry, and HTC. And now this court.

This fact, on its own, is sufficient to dismiss the second iteration of these cases. But AVT's problems don't stop there.

### b. *AVT Never Succeeded to the Agency Coupled with an Interest, and in Any Event, That Power Has Long Since Expired*

The next problem for AVT is the nature of what was assigned by AVC's recently appointed Receiver.

AVC's Receiver assigned "any and all right, title, and interest *to United States Patent No. 5,781,788 (the "Patent")* held and enjoyed by [AVC]." (Compl., Ex. F (emphasis added).) On the day that AVC's Receiver made that assignment, AVC had an undivided 2/3 interest in the '788 patent, and Hsiun had an undivided 1/3 interest in the patent. Therefore, the Receiver could at most assign to AVT a 2/3 interest in the patent. AVC's Receiver could not assign to AVT something that AVC did not own, and – even assuming AVC had succeeded to Infochips'

24

surviving rights under the Employment Agreement – AVC did not own Hsiun's interest in the patent.

AVT simply cannot argue that AVC owned Hsiun's interest in the patent, because Woo never did any of the things he could have done to obtain that interest. He did not sue Hsiun to compel her to assign her interest, and he did not exercise the irrevocable power to assign her interest to AVC.

AVT cannot, and so does not, deny these facts.[5]   Nonetheless, it says that the lawsuit can be maintained in Hsiun's absence because it has succeeded to AVC's irrevocable power to do anything necessary to obtain the patent. (*See* Pl. Opp. at 6). Indeed, AVT actually argues that Hsiun "never ha[s] any personal ownership to any rights under the '788 patent" in part because she "granted the Company power of attorney to sign her name if the Company was unable, **for any reason**, to obtain her signature on any necessary documents. (*Id.* at 9 (emphasis in original).)

Because AVT erroneously insists, as Woo insisted, that Hsiun never owned any part of the invention or the patent, its backup argument is purely theoretical. If AVT had acquired the agency coupled with an interest, it has not purported to exercise any such irrevocable power to assign Hsiun's interest in the patent (otherwise it would have undercut the argument it inherited from the hapless Woo).  Absent actual exercise of the power to sign Hsiun's name, AVT, as a simple matter of fact, is not the 100% owner of the patent. It therefore cannot maintain the lawsuit in Hsiun's absence.

---

[5] Which is not to say that AVT admits them; AVT argues that Hsiun never owned any interest in the invention or in the patent, because she assigned her rights when she signed the Employment Agreement. Unfortunately for AVT, I have already revealed the flaw in that argument and so rejected the premise of AVT's opposition papers.

But, more importantly, AVT has no such power to exercise.

It is undisputed that AVT is only the assignee of whatever interest AVC had *in the '788 patent.* The Receiver did not assign to AVT any interest that AVC may have had in any other asset that were owned by AVC – including *the Employment Agreement*, which is a wholly separate asset from the invention and the patent thereon. And it is the Employment Agreement, not the patent, that confers the irrevocable power on Infochips (and, arguably, on its successors and assigns).

AVC obtained its interest in the Employment Agreement when Woo assigned the assets he had purchased from LMS to AVC. But neither AVC nor AVC's Receiver ever assigned *the Employment Agreement* to anyone – and certainly not to AVT via the Assignment quoted above.

The absence of such an assignment is fatal to AVT's claim to the agency coupled with an interest. The whole point of the first litigation was to establish that AVC failed to convey any interest in *any* of its assets (patent, Employment Agreement, whatever) to its successor in interest, Epogy, when it became a subsidiary of Epogy. If the 2015 Decision stands for anything, it stands for the proposition that AVC did not pass title to its assets to Epogy, and that Epogy therefore could not pass title to AVC's assets to a Mr. J. Nicholas Gross, and that Mr. Gross could not pass title to AVC's assets to AVT. The 2015 Decision is final and has not been appealed; principles of former adjudication bar AVT from re-arguing the point.

So the only possible way for AVT to have acquired whatever rights AVC had as a result of its ownership of the Employment Agreement was if the recently appointed Receiver assigned AVT those rights. But the Receiver only assigned AVC's rights in the '788 Patent, and the Employment Agreement's enforcement provision are not rights *in the patent*, even though they

26

are not wholly unrelated to the patent. Assigning AVC's rights in the '788 patent did not effect an assignment of its rights in Hsiun's Employment Agreement.

So what comes next? Do we go through this exercise yet again? Does AVT go back to the Court of Chancery and ask for the appointment of yet another Receiver?

No, we don't. Because there is nothing left for AVC (or a Receiver for AVC) to assign. As Defendants correctly argue, the agency coupled with an interest by its terms was good for one thing and one thing only – it existed for the limited purpose of *obtaining* the patent. That is, it permitted the holder of the power, the agent, to sign applications and do all other lawful things that were necessary in order to get the PTO to issue a patent. *But the patent has already been obtained.* It issued in 1998. The patent has not been cancelled. The patent exists. There is no need to "obtain" it – even though the PTO was operating under a mistaken premise when it issued the patent to AVC alone.

So even if AVC's Receiver had purported to confer AVC's powers under the Employment Agreement onto AVT – which he did not – it would avail AVT absolutely nothing. Signing Hsiun's name to an assignment today cannot possibly qualify as a lawful act done *to obtain the patent.* The power cannot be broadened beyond its terms, and its terms are quite clear.

Indeed, the power no longer exists. Under California law, when the subject matter underlying a power coupled with an interest expires, the power of attorney expires. *Bonfigli v. Strachan*, 192 Cal. App. 4th 1302, 1313, 122 Cal. Rptr. 3d 447, 456 (2011), *as modified on denial of reh'g* (Mar. 24, 2011). Here, the subject matter underlying the power of attorney is the attainment of a patent. Because the patent has already issued, the power of attorney has expired. It ended in 1998, when the patent issued.

27

## 2.  AVT Never Succeeded to Any Rights Conferred by the Quitclaim

The final argument made by AVT is that it can maintain this lawsuit in Hsiun's absence because, under a "quitclaim" clause in the Employment Agreement, she deeded to Infochips and its successors and assigns her interest in any patent litigation that might be brought in connection with her invention.

The language of the quitclaim provides as follows: "I hereby waive and quitclaim to the Company any and all claims, of any nature whatsoever, which I now or may hereafter have [for] infringement of any patents, copyrights, or mask work rights resulting from any such application assigned hereunder to the Company." (Chen Decl., Ex. 3 at AVT0000121.)

For the same reason as explained above, AVT has no interest in this quitclaim. The quitclaim rights arise under the Employment Agreement; they are not part and parcel of AVC's rights under the '788 patent.  Because AVC never transferred the Employment Agreement to anyone, AVT has no rights that arise by virtue of the Employment Agreement. Whatever powers the quitclaim conferred upon AVC were never transferred to AVT.

And once again, returning to the Court of Chancery to obtain further assignment of AVC's assets would be unavailing. By its terms, the quitclaim applies only to patents that Hsiun *assigned to the Company* in accordance with the obligations she undertook in the Employment Agreement. The '788 patent is not such a patent.   Hsiun had an undoubted contractual obligation to assign the patent to Infochips or (the Court is assuming) to its successors in interest who had the benefit of the Employment Agreement. Hsiun breached her contract when she refused to execute the assignment in 1995. But her breach did not work an assignment, and Woo and AVC never sued to compel Hsiun to live up to her obligations.  Therefore, the quitclaim could never, by its terms, apply to the '788 patent.

28

## IV. The Complaint is Dismissed with Prejudice

As discussed above, the Federal Circuit has long held that a co-owner of a patent cannot maintain a suit for patent infringement absent the joinder of all co-owners. *See STC.UNM v. Intel Corp.*, 754 F.3d 940, 947 (Fed. Cir. 2014) *cert. denied*, 135 S. Ct. 1700, 191 L. Ed. 2d 676 (2015). "Indeed, generally 'one co-owner has the right to impede the other co-owner's ability to sue infringers by refusing to voluntarily join in such a suit.'" *Id.* (citing *Schering Corp. v. Roussel–UCLAF SA*, 104 F.3d 341, 345 (Fed.Cir.1997)). Thus, in the patent context, an absent co-owner of a patent is both a necessary and indispensable party to suit for purposes of Rule 12(b)(7). These lawsuits must be dismissed, because one of the co-owners of the patent is not a party to it.

Woo and AVC had a strong case for breach of contract against Hsiun when she refused to sign the assignment. They chose not to bring that lawsuit. AVT argues here that Infochips' and its successors had the right to sign Hsiun's name to a patent application and to assign her interest in the invention; but neither AVT, nor Woo or AVC before it did either of those things. Instead, they did exactly what AVT did during all the years when it was bringing infringement actions while aware of a potential defect in its title to the patent: Woo declared that AVC owned Hsiun's interest and toughed it out, hoping that no one would ever mount a challenge. Unfortunately for AVT, someone has mounted a challenge.

The dismissal is with prejudice. AVT expended considerable effort to cure the defect in title that proved fatal the last time around, but the court made no secret of the fact that the issue of Hsiun's partial ownership of the patent was still lurking, unresolved. AVT has not cured this defect, and for the reasons set forth above, it does not appear to this court that AVT can do so. Even if a Receiver for AVC assigned the Employment Agreement to AVT, AVT has no remedy left to it. It is no longer able to compel Hsiun to comply with the terms of her Employment

29

Agreement, because the statute of limitations on a breach of contract claim ran years ago. It cannot assign itself Hsiun's interest in the patent, because the agency coupled with an interest expired by its terms when the patent was obtained, 18 years ago. And the quitclaim of litigation does not apply to the '788 patent for the simple reason that Hsiun never assigned her interest in that patent to anyone.

The time to clear up the question of Hsiun's interest in the invention, and hence in the patent, was during the patent application process – not today, two decades later.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss with prejudice is granted. The Clerk of the Court is directed to remove Docket No. 18 in 15 Civ. 4626, Docket No. 17 in 15 Civ. 4631, and Docket No. 15 in 15 Civ. 4632 from the Court's list of pending motions.

Dated: June 14, 2016

_____
U.S.D.J.

BY ECF TO ALL COUNSEL